## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-275 (JMC)** |
| **v.** | : | |
| | : | |
| **JAMES ALLEN KNOWLES,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant James Allen Knowles to 3 months' incarceration and 12 months' supervised release. The government also requests that this Court impose 60 hours of community service and $500 in restitution.

### I.    Introduction

Defendant James Allen Knowles, a sixty-four year old from Pass Christian, Louisiana who is self employed in the construction industry, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Knowles was convicted at trial of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by the defendant's entering the Capitol through the Parliamentarian Door after watching another rioter violently breach that door with a cane.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Knowles's crime support a sentence of 3 months' incarceration and 12 months' supervised release in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1.

### *Defendant Knowles's Role in the January 6, 2021 Attack on the Capitol*

Knowles attended then-President Trump's speech at the Ellipse, Government Trial Exhibits ("GX") 202, 239, before joining a large crowd that walked to the Capitol grounds. Once on Capitol grounds, Knowles was part of the mob that assembled on the Northwest Lawn. GX 204B; Image 1.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.



*Image 1: Knowles on the Northwest Law (GX 204B)*

There, he watched as other rioters streamed up the steps adjacent to the Northwest Scaffolding and onto the Upper West Terrace. *Id.* Knowles made his way through the crowd of rioters, walking in the direction of the stairs. GX 234A. In an open-source video recorded by another individual, Knowles is heard saying "Come on let's go. I didn't come all this way to get stopped." *Id.*; Image 2.



*Image 2: Knowles walking toward the Northwest Scaffolding (GX 234A)*

Knowles eventually changed course and decided to circle around the Capitol. Surveillance cameras captured Knowles walking east on the lawn on the north side of the Capitol grounds. GX 111; Image 3. Snow fencing and "Area Closed" signs were positioned a few yards away from where Knowles walked on the north lawn, and provided notice that he was in a restricted area. GX 112. As Knowles walked toward the east side of the Capitol grounds, he climbed over downed snow fencing and joined the crowd streaming toward the Capitol building. At approximately the same time that Knowles approached the Capitol as part of the mob, the Secret Service was evacuating Vice President Pence to a secure location.



*Image 3: Knowles on the north lawn (GX 111)*

Knowles looped back to the west side of the Capitol building, where he stood among the sea of rioters on the Northwest Courtyard. GX 210; Image 4. There, he focused his attention on the Parliamentarian Door, Image 4, where he watched another rioter smash the glass windows of the door using a cane, reach inside, unlatch the locked door, and breach the entrance, causing a flood of rioters to enter the building, GX 235; Image 5.



*Image 4: Knowles on the Northwest Courtyard (GX 210)*

5



*Image 5: Rioter (red box) breaching the Parliamentarian Door (GX 235)*

Capitol CCTV captured the breach from the hallway inside the Parliamentarian Door, as glass shards flew off the door's window that the rioter repeatedly struck with the cane. GX 105. As they tried to gain entry to the Capitol, rioters within Knowles's field of vision violently assaulted the outnumbered U.S. Capitol Police officers inside the doorway. *See id.*; Image 6.



*Image 6: Rioters breaching the Parliamentarian Door (GX 105)*

After Knowles watched this chaotic, violent breach, he joined the flood of rioters who entered the Capitol through the Parliamentarian Door. GX 221; Image 7. As he entered, an alarm from the breached door blared.



*Image 7: Knowles entering the Capitol (GX 211)*

Capitol CCTV captured Knowles as he entered the building at 2:47 p.m., mere minutes after he watched other rioters breach the Parliamentarian Door. GX 105. Once inside, Knowles entered the Parliamentarian's office suite. *Id.*; Image 8. Images from the aftermath of the riot showed the destruction caused by rioters inside the Parliamentarian's office. *See, e.g.*, GX 218; Image 9.



*Image 8: Knowles walking into the Parliamentarian's office suite (GX 105)*



*Image 9: Parliamentarian's office in the aftermath of the riot (GX 218)*

Knowles exited the Capitol at approximately 2:50 p.m. GX 105. After exiting the building,
Knowles addressed the crowd using a megaphone (as seen during the trial, the content of what he
said was largely inaudible). GX 208; Image 10.



*Image 10: Knowles addressing the crowd with a megaphone (GX 208)*

Even after he witnessed the chaos and destruction inside the Capitol building, Knowles remained on the Capitol grounds. *See* GX 106.

*The Charges*

On August 8, 2023, the United States charged Knowles by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). On October 8, 2024, a jury convicted Knowles of Count One of the Information, which charged a violation of 18 U.S.C. § 1752(a)(1).[2]

## III.    Statutory Penalties

Knowles now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As set out in the PSR, a violation of 18 U.S.C. § 1752(a)(1) carries a maximum term of imprisonment of 12 months'

---

[2] The jury acquitted Knowles of Counts Two, Three, and Four, which charged Knowles with violating 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G), respectively.

incarceration, 12 months' supervised release, and a fine of up to $100,000. PSR ¶¶ 59, 63, 74. As an alternative to a sentence of incarceration, 18 U.S.C. § 1752(a)(1) carries a maximum term of probation of five years. PSR ¶ 67.

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR and included below:

Count One (18 U.S.C. § 1752(a)(1)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B2.3(a)): Trespass | +4 |
| Special Offense Characteristic (U.S.S.G. § 2B2.3(b)(1)(A)(vii)) | +2 |
| Adjustment (U.S.S.G. § 4C1.1): Zero-Point Offender | -2 |
| **Total Adjusted Offense Level** | **4** |

*See* PSR ¶¶ 29–38.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

While the Government concedes that U.S.S.G. § 4C1.1 applies to Knowles, the Court

should vary upward by two levels to account for the reduction under § 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. I*See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the § 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who

have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

In any event, whether the Court does or does not vary upwards two levels, Knowles's Guidelines range would remain the same. The U.S. Probation Office calculated Knowles's criminal history as a category I. PSR ¶ 41. Accordingly, the U.S. Probation Office calculated Knowles's total adjusted offense level at 4, and his corresponding Guidelines imprisonment range at 0 to 6 months' imprisonment. PSR ¶¶ 60. If Knowles's total adjusted offense level was six, his corresponding Guidelines range would still be 0 to 6 months' imprisonment.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 3 months' incarceration and 12 months' supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Knowles's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Knowles, the absence of violent or destructive acts is not a mitigating factor. Had Knowles engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Knowles's case is that he watched, from a few yards away, as another rioter smashed the windows of the Parliamentarian Door and violently pushed past officers to breach the building. Even after watching this destructive entry into the Capitol, Knowles decided to himself join the flood of rioters who streamed into the Parliamentarian hallway. There can be no ambiguity as to whether Knowles believed he was lawfully entering the building.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 3 months' incarceration and 12 months' supervised release in this matter.

### B.  Knowles's History and Characteristics

As noted in the PSR, Knowles refused to cooperate with the presentence investigation, which included refusing to provide information about his personal and family history, physical condition, mental and emotional health, substance abuse history, education, employment, and financial condition. PSR ¶ 46. Knowles's refusal to provide even the most basic of background

information severely limits the Court's ability to weigh his history and characteristics, as mandated by 18 U.S.C. § 3553(a), and demonstrates Knowles's disrespect for the judicial process, this Court, and the rule of law. The Court should reject any attempt by Knowles to circumvent the PSR process by providing his own cherry-picked summary of his history and characteristics in his sentencing memo. He was given every opportunity to participate in this essential step ahead of sentencing and he has flatly refused.

Knowles's complete refusal to participate in the presentence investigation process should come as no surprise to the Court. He repeatedly insisted, at hearings and in filings, that he entered only a "special appearance," a suggestion that he did not recognize the Court's jurisdiction over him. Knowles also mailed the Court and counsel for the government roughly 100 letters over the course of a few months that—at least for the letters government counsel reviewed—contained classic sovereign citizen language, further suggesting that he did not view the criminal case against him as legitimate.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

14

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Knowles had a front-row view of a violent breach of the Capitol building—one that saw officers assaulted, property destroyed, and the peaceful transfer of power temporarily halted. While Knowles was not charged with violence or property destruction, he saw other rioters commit acts of violence and property destruction and he nonetheless remained part of that mob. His decision to unlawfully enter the Capitol building contributed to delaying the Joint Session's essential mission. For that, the Court should sentence Knowles to a term of imprisonment sufficient to ensure that he is deterred from future acts of criminal conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[3] This Court must sentence Knowles based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Knowles was found guilty on Count One of the Information, charging him with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A/B misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Mark Sahady*, 21-cr-134-CJN. Following a bench trial, Judge Nichols convicted Sahady of four misdemeanor counts, charging violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G), and sentenced Sahady to 5 months'

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

imprisonment and 12 months' supervised release. Sahady, like Knowles, watched the breach of the Parliamentarian Door—cheering as the rioter smashed in the windows. After watching the breach, Sahady, like Knowles, entered the Capitol and witnessed the chaos inside the Parliamentarian hallway. Sahady remained inside the building for 18 minutes, longer than Knowles. And, unlike Knowles, there was significant evidence showing that leading up to January 6, Sahady contemplated attempting to prevent Congress from certifying the election. Sahady was also convicted on all four misdemeanor counts, unlike Knowles who was acquitted on Counts Two, Three, and Four.

*United States v. Jia Liu*, 21-cr-711-TJK. Liu pleaded guilty to a single count of violating 18 U.S.C. § 1752(a)(1) and was sentenced by Judge Kelly to 4 months' imprisonment.[4] Liu entered the Capitol through the Senate Wing Door and remained inside for roughly seven minutes. Like Knowles, after exiting the building, Liu remained in the northwest courtyard, where he witnessed additional attempts to breach the building and other violent conduct by rioters. While Liu was closer to others' confrontations with law enforcement than Knowles, each knew the violent and destructive nature of the crowd around them and nevertheless remained unlawfully on the Capitol grounds. Most importantly, like Knowles, Liu's conviction was for a single count of violating 18 U.S.C. § 1752(a)(1). Unlike Knowles, however, Liu accepted responsibility for his criminal offense.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

---

[4] At the time of sentencing for his January 6-related offense, Liu also faced unrelated federal charges in the Eastern District of New York. Judge Kelly ordered that Liu's four-month sentence in the January 6 case run consecutive to any sentence imposed by the district judge in New York.

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or

deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Knowles was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[5]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion

---

[5] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Knowles to pay $500 in restitution for his convictions on Count One. This amount fairly reflects Knowles's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Fine

Knowles's conviction for violating 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d) (setting out factors for the Court

to consider in imposing a fine). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, by refusing completely to provide the Probation Office with financial statements, Knowles has not shown an inability to pay. PSR ¶ 58. Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range is $500 to $9,500. U.S.S.G. § 5E1.2(c). The Court should not allow Knowles to now avoid a fine simply by refusing to participate in the PSR process.

## VIII.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Knowles to 3 months' incarceration and 12 months' supervised release. The government also requests that this Court impose 60 hours of community service and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Knowles's liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Terence Parker*
TERENCE PARKER
Trial Attorney (detailee)
U.S. Attorney's Office for the District of Columbia
New York Bar No. 5775192
Terence.Parker3@usdoj.gov
(202) 803-1600

/s/ *Sara E. Levine*
SARA E. LEVINE
Assistant United States Attorney
VA Bar No. 98972
601 D Street NW
Washington, DC 20530
sara.levine@usdoj.gov
(202) 252-1793

*Counsel for the United States*

22